IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TONI MILLER, SUSAN ELLIOTT, ARIEL KLEINSMITH AND ANTWAN LEE | § § § | |
| PLAINTIFFS | § § | |
| VS. | § § | CIVIL ACTION NO. 3:13-cv-1509 |
| | § | JURY |
| TEAM GO FIGURE, L.L.P., TEAM GO FIGURE AND SCOTT ESKRIDGE | § § | |
| | § | |
| DEFENDANTS | § | |

---

**DEFENDANTS TEAM GO FIGURE, L.L.P., TEAM GO FIGURE
AND SCOTT ESKRIDGE'S BRIEF IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT**

---

**Table of Contents**

I.    INTRODUCTION ............................................................................................. 1

II.   FACTUAL BACKGROUND ........................................................................... 2

    A.    Team Go Figure .................................................................................... 2

    B.    Miller's Employment History with Team Go Figure ........................... 2

        1.    Miller's primary job duties as Sales Manager ........................... 2

        2.    Interviewing job applicants ........................................................ 6

        3.    Training employees ..................................................................... 7

        4.    Evaluating employee performance ............................................. 8

        5.    Using judgment and discretion ................................................... 9

        6.    Miller customarily directed the work of two or more employees .............. 9

    C.    Elliott's Employment History with Team Go Figure .......................... 10

        1.    Elliott's work was directly related to the general business operations of TGF ...................................................................... 11

        2.    Elliott exercised discretion and independent judgment with respect to matters of significance ................................................ 13

    D.    Miller and Elliott's Termination from Team Go Figure ....................... 14

    E.    Kleinsmith's Employment History with Team Go Figure ................... 14

III.  ARGUMENT & AUTHORITIES ................................................................... 17

    A.    Summary Judgment Standards ............................................................ 17

    B.    Requirements Under The Fair Labor Standards Act ............................ 19

    C.    Executive Exemption Requirements .................................................... 19

        1.    Compensation ............................................................................ 20

        2.    Primary duty .............................................................................. 20

        3.    Customarily directs work of two or more employees ............... 23

        4.    Authority to hire and fire or particular weight given to recommendations and suggestions ............................................ 24

    D.    Miller Falls Within the Executive Exemption and Therefore is Not Entitled To Overtime .......................................................................... 25

        1.    Miller was paid a salary of over $455 per week ....................... 25

        2.    Miller's primary duty was management of recognized departments ........ 26

        3.    Miller's primary duty included the supervision of two or more employees ................................................................................. 26

        4.    Miller's recommendations with regard to hiring, firing or other change of status were given particular weight ......................... 27

E.    The Administrative Exemption Requirements..........................................27

    1.    Compensation ..........................................................................28

    2.    Work directly related to the management or general business operations of the employer.........................................................28

    3.    The exercise of discretion and independent judgment with respect to matters of significance .................................................29

F.    Miller Falls Within the Administrative Exemption and Therefore is Not Entitled To Overtime ....................................................................33

G.    Elliot was Administratively Exempt and Therefore Not Entitled to Overtime ...............................................................................................37

    1.    Beginning in March of 2012 Elliott's annual salary was more than $455 per week ...........................................................................37

    2.    Elliott performed non-manual work related to Team Go Figure's management or general operations ............................................37

H.    Outside Sales Exemption Requirements ...............................................40

    1.    Compensation ..........................................................................40

    2.    Primary duty of marking sales .................................................40

    3.    Customarily and regularly engaged away from employer's place of business ...................................................................................41

I.    Kleinsmith Falls Within the Outside Sales Exemption and Therefore is Not Entitled to Overtime...................................................................41

J.    Miller's Improper Payroll Deduction Claim was Adjudicated in Another Proceeding and is Therefore Barred Based on *Res Judicata* ...............................42

K.    Plaintiffs Cannot Prove Their Damages Claim with Definite And Certain Evidence...............................................................................................43

L.    Elliott Cannot Prove Her Damages Claim With Definite and Certain Evidence...............................................................................................45

M.    The Court Should Require Calculation of any Damages Using the Fluctuating Work Week – "Half-Time" Damage Calculation............................46

IV.    CONCLUSION....................................................................................................48

## TABLE OF AUTHORITIES

**Cases**

29 C.F.R. § 541.202(b) ................................................................................. 32, 33

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) .................................. 18, 44

*Aquirre v. SBC Commc'ns, Inc.*, No. H-05-3198, 2007 U.S. Dist. LEXIS 72666, at*69-70 (S.D. Tex. Sept. 30, 2007) ................................................................................ 23

*Billingslea v. Brayson Homes, Inc.,* 2007 U.S. Dist. LEXIS 52566 (N.D. Ga. July 19, 2007) ......................................................................................................... 41, 42

*Blackmon v. Brookshire Grocery Co.*, 835 F.2d 1135 (5th Cir. 1988)........................... 47

*Blackmon v. Brookshire Grocery, Co.*, 835 F.2d 1135 (5th Cir. 1988)......................... 48

*Brown v. City of Hous.*, 337 F.3d 539, 541 (5th Cir. 2003)......................................... 18

*Bullard v. Babcock & Wilcox Tech. Servs. Pantex, L.L.L.*, No. 07-CV-049-J, 2009 U.S. Dist. LEXIS 50906 (N.D. Tex. 2009)........................................................................ 38

*Cantu v. Jackson Nat'l Life Ins. Co.*, 579 F.3d 434, 438 (5th Cir. 2009) ..................... 18

*Cheatham v. Allstate Ins. Co*., 465 F.3d 578, 584 (5th Cir. 2006) ............................ 19, 35, 36, 39

*Dalheim v. KDFW-TV*, 918 F.2d 1220, 1224 (5th Cir. 1990).......................... 19, 21, 22

*Donovan v. Burger King Corp.*, 675 F.2d 516 (2d Cir. 1982 ....................................... 26

*Duffie v. U.S.*, 600 F.3d 362, 371 (5th Cir. 2010).......................................................... 17

*Duplessis v. Delta Gas, Inc.*, 640 F. Supp. 891, 895 (E.D. La. 1986) ........................... 19

*Dymond v. United States Postal Service*, 670 F.2d 93, 95 (8th Cir. 1982)............................ 30, 31

*Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)....................................... 18

*Gallegos v. Equity Title Co. of Am., Inc.*, 484 F. Supp. 2d 589, 596 (W.D. Tex. 2007) .............. 31

*Gellhaus v. Wal-Mart Stores, Inc*., 769 F. Supp. 2d 1071, 1073 (E.D. Tex. 2011)...................... 25

*Harvill v. Westward Commc'ns, LLC*, 311 F. Supp. 2d 573, 583 (E.D. Tex. 2004) *aff'd*, 433 F.3d 428 (5th Cir. 2005) .................................................................................. 19

*Hein v. PNC Fin. Servs. Group Inc*., 511 F. Supp. 2d 563 (E.D. Pa. 2007) ................................ 29

*Hesseltine v. Goodyear Tire & Rubber Co.*, 391 F. Supp. 2d 509, 516 (E.D. Tex. 2005) ........... 44

*Id.* ................................................................................................................... 25

*In re Southmark Corp.*, 163 F.3d 925, 934 (5th Cir.1999) ............................................................ 43

*Karr v. City of Beaumont*, 950 F. Supp. 1317, 1321 (E.D. Tex. 1997) ........................................ 19

*Kastor v. Sam's Wholesale Club*, 131 F. Supp. 2d 866-67 (N.D. Tex. 2001) ............ 21, 22, 24, 26

*Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 374-75 (7th Cir. 2005) ......................... 39

*Lott v. Howard Wilson Chrysler Plymouth, Inc.*, 203 F.3d 326, 331 (5th Cir. 2000).................. 19

*Lyles v. K-Mart Corp.*, 519 F. Supp. 756 (M.D. Fla. 1981) ......................................................... 26

*Marshall v. Sally Beauty Co.*, No. 80-4138, 1982 U.S. Dist. LEXIS 13604, at *10 (E.D. La. April 19, 1982)........................................................................................................................ 21

*McAllister v. Transamerica Occidental Life Ins. Co.*, 325 F.3d 997, 1001 (8th Cir. 2003)........ 39

*McCowin v. Schwerman Trucking Co.* No. 6:08-cv-421, 2010 U.S. Dist. LEXIS 91408, at *6 (E.D. Tex. Sept. 2, 2010) ....................................................................................................... 18

*McKee v. CBF Corp.*, No. 3:06-CV-1629-G, 2008 U.S. Dist. LEXIS 22091, at *10 (N.D. Tex. March 19, 2008), *aff'd*, 299 Fed. Appx. 426 (5th Cir. 2008) ............................................... 35

*Mims v. Starbucks Corp.* ............................................................................................................... 23

*Murray v. Stuckey's, Inc.*, 939 F.2d 614, 618 (8th Cir. 1991) ........................................ 21, 23, 26

*Newton v. City of Henderson*, 47 F.3d 746, 748 (5th Cir. 1995) ................................................. 19

*O'Dell v. Alyeska Pipeline Service Co.,* 856 F.2d 1452, 1454 (9th Cir. 1988) ........................... 30

*Overnight Motor Transp. Co. v. Missel,* 316 U.S. 572 (U.S. 1942) ............................................. 47

*Pendergraft v. Fujitsu Network Communs., Inc.*, No. 3:10-CV-2047-L, 2011 U.S. Dist. LEXIS 96146, at *2 (N.D. Tex. Aug. 26, 2011)......................................................................... 33, 34

*Petro–Hunt, L.L.C. v. United States*, 365 F.3d 385, 395 (5th Cir.2004) ..................................... 43

*Piscione v. Ernst & Young, LLP*, 171 F.3d 527, 535-43 (7th Cir. 1999)...................................... 32

*Posely v. Eckerd Corp.*, 433 F. Supp. 2d 1287, 1306 (S.D. Fla. 2006) ....................................... 22

*Rainey v. McWane, Inc.*, 552 F. Supp. 626 (E.D. Tex. 2008)....................................................... 26

*Reeves v. International Tel. & Tel. Corp.* 616 F.2d 1342, 1351 (5th Cir. 1980)........................... 44

*Rubery v. Buth-Na-Bodhaige, Inc.*, 470 F. Supp. 273, 276 (W.D.N.Y. 2007) ......................... 21

*Rushing v. Kan. City S. Ry. Co.*, 185 F.3d 496, 505 (5th Cir. 1999) ............................................ 18

*Schwind v. EW & Assocs.*, 357 F. Supp. 2d 691, 703 (S.D.N.Y. 2005) ...................................... 21

*Singer v. City of Waco*, 342 F.3d 813, 818 (5th Cir. 2003) .......................................................... 19

*Smith ex rel. Estate of Smith v. Unites States*, 391 F.3d 621, 625 (5th Cir. 2004) ...................... 18

*Stein v. J.C. Penney Co.*, 557 F. Supp. 398, 404 (W.D. Tenn. 1983) .......................................... 21

*Strokes v. BWXT Pantex*, LLC, 424 Fed. Appx. 324 (5th Cir. 2011) ........................................ 38

*Thomas v. Speedway SuperAmerica, LLC*, 506 F. 3d 496, 507 (6th Cir. 2007) .................... 23, 26

*Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 402 (5th Cir. 2002) ............................................ 19

*Vela v. City of Hous.*, 276 F.3d 659, 677 (5th Cir. 2001) .......................................................... 20

*Verkuilen v. Mediabank, LLC*, No. 09-C-35-27, 2010 U.S. Dist. LEXIS 77407, at *3 (N.D. Ill. July 27, 2010) ............................................................................................................. 36, 37

*Wenner v. Tex. Lottery Comm'n*, 123 Fed 321, 324 (5th Cir. 1997), cert. denied, 523 U.S. 1073 (1998) ................................................................................................................................. 19

*Williams v. Time Warner Operation, Inc.*, 98 F.3d 179, 181 (5th Cir. 1996) .............................. 18

*York v. City of Wichita Falls,* 48 F.3d 919, 921 (5th Cir. 1995) ................................................. 19

## Statutes

§ 541.100 ...................................................................................................................................... 21

29 C.F.R. § 541.100 ................................................................................................................ 24, 27

29 C.F.R. § 541.100(a)(1)-(4) ...................................................................................................... 20

29 C.F.R. § 541.102 ...................................................................................................................... 21

29 C.F.R. § 541.106 ...................................................................................................................... 21

29 C.F.R. § 541.200(a)(1)-(3) ...................................................................................................... 27

29 C.F.R. § 541.200(a)(3) ............................................................................................................ 30

29 C.F.R. § 541.201(a) ................................................................................................................. 29

29 C.F.R. § 541.201(b) ................................................................................................................. 29

29 C.F.R. § 541.202(a) ............................................................................................................ 31, 33

29 C.F.R. § 541.202(c) ............................................................................................................ 31, 35

29 C.F.R. § 541.203 ................................................................................................. 29

29 C.F.R. § 541.205(b) ........................................................................................... 29

29 C.F.R. § 541.207(a) ............................................................................................ 35

29 C.F.R. § 541.500 ................................................................................................. 40

29 C.F.R. § 541.500(b) ........................................................................................... 40

29 C.F.R. § 541.501 ................................................................................................. 40

29 C.F.R. § 541.700(a) ............................................................................................ 28

29 C.F.R. § 541.700(b) ................................................................................ 21, 24, 28

29 C.F.R. § 541.701 ................................................................................................. 31

29 C.F.R. § 541.708 ................................................................................................. 22

29 U.S.C. § 207(a)(1) .............................................................................................. 19

29 U.S.C. § 213(a)(1) .............................................................................................. 40

29 U.S.C. § 213)(a)(1) ............................................................................................. 19

**Other Authorities**
DOL Wage & Hour Div. Op. Ltr. (January 14, 2009) .............................................. 47

*W.H. Div. Op. Ltr.* 2007-2 (January 25, 2007) ...................................................... 31

W.H. Op. Ltr., 1992 WL 845098 (Aug. 20, 1992) ................................................... 23

W.H. Op. Ltr., FLSA 2006-43 (Nov. 27, 2006) ....................................................... 29

**Rules**
Fed. R. Civ. P. 56(c) ................................................................................................ 17

**Regulations**
." 69 Fed. Reg. 22143 (April 23, 2004) ................................................................... 31

69 Fed. Reg. 22122, 22186 (Apr. 23, 2004) ............................................................ 22

## I.      INTRODUCTION

Plaintiffs Toni Miller ("Miller"), Susan Elliott ("Elliott") and Ariel Kleinsmith ("Kleinsmith") (collectively "Plaintiffs")[1] sued their former employer, Defendants Team Go Figure, LLP, and its General Managing Partner, Scott Eskridge (collectively "TGF"), alleging violations of the Fair Labor Standards Act ("FLSA"), claiming they were not properly classified as exempt from overtime and therefore entitled to overtime pay. Dkt. 1.

The undisputed facts conclusively establish that: (1) Miller's job duties rendered her exempt from overtime pay under both the executive and administrative exemptions; (2) Elliott's job duties rendered her exempt from overtime pay under the administrative exemption; and (3) Kleinsmith's job duties rendered her exempt from overtime pay under the outside sales exemption. Even if Plaintiffs are not exempt, Plaintiffs cannot prove their claims for damages with definite and certain evidence. Miller also alleged that TGF improperly deducted certain amounts from her paycheck, Dkt. 1 at ¶19, but that claim was tried to judgment in another proceeding and therefore is barred by *res judicata*. For these reasons, Defendants are entitled to summary judgment as a matter of law.

In the alternative, Defendants are entitled to partial summary judgment and, in the event the jury finds Plaintiffs were improperly classified, any calculation of damages must be conducted pursuant to the fluctuating workweek method.

---

[1] Plaintiff Antwan Lee voluntarily dismissed his claims on August 8, 2008. Dkt. 12.

## II.      FACTUAL BACKGROUND

### A.      Team Go Figure

TGF manufactures and sells uniforms for cheerleading and scholastics-related dance teams in Texas. APP408.[2] TGF was started by Scott Eskridge ("Eskridge") over twenty years ago in his home. *Id.* Eskridge had the idea to manufacture dancewear and sell it directly to schools at competitive prices. *Id*. Since its inception, TGF has operated as a designer, manufacturer, and retailer of dancewear and other team apparel to dance, drill and cheer teams, as well as other teams such as color guard and bands, across and even outside of Texas. *Id*. TGF's principal place of business is located in Garland, Texas. *Id*. Over the years, it has grown into a company now employing approximately 36 full and part-time employees. *Id*.

### B.      Miller's Employment History with Team Go Figure

Miller worked as the Sales Manager and Creative Director at TGF for almost 3 years from on or around April 26, 2010 to March 4, 2013. APP2.1, 409-412. She was initially hired at a starting annual salary of $78,000 per year. APP153, 409-412, 467.

#### 1.      Miller's primary job duties as Sales Manager

TGF is organized into four departments – design, manufacturing and shipping, sales, and payroll/human resources. APP409-412. As the owner of the company, Eskridge oversees the departments managed by others. *Id*. On or around April 26, 2010, TGF hired Miller as the Sales Manager/Creative Director. *Id*., APP3. Miller reported directly to Eskridge and was responsible for the management and operations of the sales department. *Id*.

During Miller's employment, TGF had various sales territories, including North Houston, South Houston, East Texas, Austin, San Antonio and the DFW area. APP35, 409-412. As Sales

---

[2] For brevity, all references to evidence in Defendants' appendix in support of its motion for summary judgment will be designated by "APP" followed by the specific page number where the evidence supporting Defendants' assertion may be found.

Manager, Miller was responsible for the various sales territories across Texas and all outside sales representatives. APP34-35. Outside sales representatives reported to Miller, and she maintained a white board in her office that identified TGF's territories with new or returning customers. APP34-37, 89-91. She directed and instructed others regarding sales procedures. APP151. She monitored and oversaw outside sale representative activities, including the setting of appointments with existing and prospective customers and preparing weekly reports regarding the status of sales calls. APP139-141, 171-172, 185. In fact, Miller admitted that she would accompany her sales representatives to appointments if there was a director that "we had an issue with or if it was a director that maybe needed some hand-holding …" APP142-143, 186. Miller describes this aspect of her job as "promoting the company" as opposed to sales. APP144. Regardless, as she admits, it was part of her job in managing the sales team. *Id*. She herself travelled to customers to display samples of new merchandise. APP57-58. Miller not only conducted sales herself, but also trained employees to do so as well. APP16, 42-43, 118-119, 148-149, 151.

Miller's duties included tracking TGF's sales. APP6. One of Miller's principal duties was to monitor the sales efforts of her sales team, which included obtaining weekly reports she later provided to Eskridge. APP120-123, 171-172. If an outside sales representative did not provide a weekly report, Miller would send an email to follow-up on the status of the report. APP21. Miller further made suggestions to her sales team on upcoming appointments and recommendations for increasing sales. APP148-151, 188-189. She was interested in scheduled appointments because that was where the sales was probably going to happen. APP140.

Miller also kept track of all fittings, an occasion where TGF would meet with a school team to allow team members an opportunity to select sizes and specific items for purchase by a

particular customer. APP32-33, 409-412. Miller kept a white board in her office detailing every fitting that was scheduled to occur. APP32. The outside fittings provided sales representatives an opportunity to promote TGF and establish or improve relationships with customers. APP144, 321. If outside sales representatives for particular territories were not available for a fitting, Miller, as well as other TGF employees, might be required to handle the fittings. *Id.* As Sales Manager, however, Miller's principal duties and responsibilities remained the management of her sales team and department, and she spent a majority of her time on a daily basis performing those duties. *Id.*, APP409-412.

To ensure proper staffing, Miller assisted Eskridge with the hiring, training, and terminating outside sales representatives, including those sales representatives that covered the DFW territories in close proximity to TGF's office. APP409-412. Miller further counseled her sales team on the appropriate use of vacation time and seasons during the year in which taking time off was not preferred or allowed. APP104-107, 163-165. She reviewed e-mails from her team to customers and provided suggestions related to sales. APP125-126, 173, 174.

Miller further provided input into whether TGF participated in various conferences, conventions, or trade shows. APP50-51, 68-69, 93, 98. She also attended conferences and trade shows. APP52, 68-69, 98, 409-412. She was also responsible for "saving large house accounts" – accounts which Miller contends were going to other companies but stayed with TGF because of her "relationships with them." APP9.0-9.3, 45. Miller contends that these responsibilities were not part of being the "Sales Manager" but rather an aspect of "customer service" or promotion *Id.*, APP69. Unlike other customer service representatives who were located in the front office and reported to April McDougald, Miller reported directly to Eskridge and had her own office. APP11, 36-37.

4

Miller's position included promoting the company in an effort to increase sales not only within the DFW area, but in the sales territories handled by the outside sales representatives that Miller supervised. APP51-53. Miller testified she was interested in booked appointments of her team because that is where the sale is most likely to happen. APP140. She made calls and went to outside meetings with customers for the purpose of establishing a better rapport and in order to make sales. APP27-28, 92.

Miller also testified she was responsible for servicing clients. APP40. This involved meeting outside of the office with existing customers who had given no indication that they would be doing business with TGF again. APP11, 36-37, 113.1-114. Miller's role was to "maintain" these clients who "were doing business with TGF because of a relationship and a quality of product …" APP41. At her deposition, Miller attempted to distinguish this role from her job as the Sales Manager. APP114-116. (In Miller's words, "the sale was already secured. I was making sure it stayed secured.") APP114. She described her job responsibility as promoting the relationship of TGF and cleaning up TGF's image. APP114-116. Nevertheless, one of her key responsibilities was management of the sales department, which included meeting with both prospective and existing customers. APP51-52. She recognized that service, follow-up and guidance were important to sales. APP118-119. She further admitted that "maintenance of a client" was "part of sales" and therefore a sales call. APP129; *See also* APP113.1.

Miller contends there were hourly customer service representatives, who work in the front office and had similar duties. APP2.2-2.3. However, Miller testified that the "customer service" aspect of *her* position was different. APP11, 116. Miller describes her job as the "cleanup crew and to put a bright and shiny, happy image on the company and preserve a sale …" APP115-116. And, although she tried to get others to treat customers the same way, her job

was to be the promotions person, a job which TGF expected Miller to fill as the Sales Manager. APP144.1-144.2, 409-412.

In April of 2012 (after two years of employment with TGF), Miller discussed with Eskridge the possibility of a raise. APP22-23, 87. Miller provided Eskridge salary ranges for "sales" of $90,000+ and "creative director" of $110,000+ based on her internet research. *Id.*, APP87. She provided no suggested salaries for marketing or customer service positions and certainly made no suggestion that she should be paid on an hourly basis. *Id.* Miller testified that she thought she was entitled to the raise because she had been there two years, had done a good job and "had done a good job of customer relations." APP24. Miller felt she was also entitled to a percentage of overall sales because Eskridge "had offered it" and she "was the one in the office that *everything* filtered through" – *everything* in terms of sales, customer relations, working on the catalog and fulfilling her role as creative director. APP24-25. (emphasis added).

As TGF's Sales Manager and Creative Director, Miller supervised Kristy Mraz, a graphic designer and helped with the creation of appliques and signage. APP361, 411. Miller also made recommendations with respect to merchandising and selection of products. APP54-55, 90, 155-156. TGF had a new catalog every year. APP57. Approximately 45 days of the year, during the months of October and November, Miller, as the Creative Director, oversaw the catalog process. APP56. She further helped develop promotional material, such as team incentive flyers. APP66-67, 97.

## 2.  Interviewing job applicants

Miller's job duties included soliciting prospective employees, scheduling interviews, interviewing, following-up with prospective employee references, and helping to select job applicants for employment. APP66, 96, 130-131, 145, 177. Miller admits that she interviewed applicants for TGF's San Antonio sales representative position. APP61-65, 95.1. Miller

interviewed Kleinsmith and contacted Kleinsmith to advise Kleinsmith that she had the job. APP327-328. Miller was also involved in interviewing and hiring of Tabitha Corker. APP366. Miller traveled to Houston and San Antonio to interview outside sales candidates. APP409-412. Eskridge relied on, considered, and gave particular weight to the input and recommendations of Miller and frequently followed her recommendations. *Id*.

### 3.   Training employees

Miller's duties included training outside sales representatives. APP16-17, 322. As Miller testified:

> Q:  And then at other points in time, you actually then trained some of the folks, such as Ariel Kleinsmith who testified in her deposition that she was trained by you?
>
> A:  We – I would – I would – I would go with them and make sure they were presenting the information correctly and then confirmed with [Eskridge] they were doing the job that he was wanting them to do.
>
> *        *        *
>
> Q:  Part of your training of employees was that you would go with them to their outside sales presentations, or meetings or whatever you want to call it and you would listen to how they talked to the customer; and you would say, Yeah, this is the way we do it at Team Go Figure, or, No, I think this is a better approach, something kind of to that effect? Correct?
>
> A:  Yes.

APP16-17.

Miller was further responsible for orienting new outside sales representatives to the company. APP60-61. Miller admitted that promoting and trying to encourage outside sales representative to get excited about their job and training fell within one of her duties and responsibilities as a Sales Manager. APP61. Miller also held herself out to the outside sales representatives as the Sales Manager and their supervisor. APP60, 95, 137, 287. Miller counseled

her sales team on appropriate use of vacation time and explained TGF's policy regarding use of samples or sizes and the importance of samples in working a sale. APP104-108, 163-166. Miller's sales team contacted her with suggestions. APP113, 170. Miller offered recommendations and suggestions in terms of revisions to her team's sales contract. APP70-73, 99.

Kleinsmith testified that Miller trained her. APP322-323. Kleinsmith also testified that if she had a question about how to handle a sale, she understood that she was to direct that question to Miller and Miller was the person she reported to. APP324-325.

### 4.     Evaluating employee performance

Miller evaluated the weekly performance of the outside sales team, including sales representatives responsible for the territories in and around the DFW area. APP78-80, 102, 125-128, 175-176. Although Miller suggested at her deposition that she simply printed out emails and gave them to Eskridge for review, she admitted that a function of her job was to review emails of the outside sales representative as she was the person to whom those employees reported. APP18-19. She also had responsibility for employee discipline and gave both verbal and written warnings to employees who were not performing their job appropriately. APP73-78, 100, 136-137, 180-183, 343.1, 355.1. Verbal and written warnings are an integral part of the process at TGF leading to potential termination of an employee. APP409-412. She further directed employees under her supervision on the quality of their work. APP21, 152, 190.

During Kleinsmith's deposition, Kleinsmith provided an example of Miller counseling Kleinsmith on her failure to turn in her weekly report. APP341-342, 355. Kleinsmith also testified that Miller had verbal discussions with Kleinsmith wherein she discussed that Kleinsmith was not following administrative procedures designed by management. APP343, 355.1.

Miller also gave recommendations with respect to termination and handled some terminations. APP110-113 (recommendation for Tabitha Corker), APP77-78, 101 (termination of Melissa Birdwell). Eskridge considered and gave particular weight to the input and recommendations of Miller and frequently followed her recommendations in terms of employee terminations. APP110-113, 409-412.

### 5.    Using judgment and discretion

Miller exercised judgment and discretion with respect to a variety of significant issues. She provided guidance and direction to associates regarding customer service and dealing with customer complaints, as well as best approaches for handling outside sales presentations. APP17, 356.2, 409-412. In fact, she admitted she was hired to put a "new face" on TGF and specifically to address customer complaints. APP8. Her job duties included meeting with customers to listen to their concerns and suggesting a resolution. APP134-135. She would work with customers who were upset or disgruntled and "talk them out of the tree." APP9.1-9.3. Miller admitted that her job involved delegating directions to her team, which is inherently a task requiring independent judgment and discretion. APP411.

### 6.    Miller customarily directed the work of two or more employees

Miller admitted that she was the supervisor of the outside sales representatives, including those who worked in the Garland office, but only when they were conducting outside sales. APP76. These outside sales representative included Michelle Holland, Kirsten Kosack, Hollie Hess and Lanae Hudson, who were retained to handle the South Houston, North Houston, East Texas and Austin territories. APP15. Kleinsmith, one of the sales representative who worked out of the Garland office, testified that Miller supervised her, as well as anyone who did sales. APP318. To her team, Miller described herself not as "the Sales Manager," but as "your Sales

Manager" and admitted that she described her and her representatives as being on the "same team" and working on their "common goal of success." APP107-108, 165. Miller also supervised Tabitha Corker, the sales assistant. APP109-110. In fact, Miller met with her sales team to discuss Tabitha Corker's role as the sales assistant. APP148, 188.

During Miller's 147 weeks of employment with TGF, Miller supervised at least two outside sales representatives and assistants for 111 weeks of the 147 weeks of her employment. APP14-15, 79-80, 81, 88, 109, 132-133, 138-140, 409-412, 469-472. Miller also supervised graphic designers, Kristy Mraz and Deidre Buchanan from the day she starting working at TGF. APP54-55, 409-412.

### C.    Elliott's Employment History with Team Go Figure

TGF hired Elliott on or around August 12, 2011 as its bookkeeper. APP125. TGF initially paid Elliott hourly so they could monitor her work ethic and observe hours. APP412-414. During this time she was provided overtime pay for reported hours worked. *Id*. In or around January of 2012, after approximately five months of employment with TGF, Elliott's pay was adjusted to a base salary of $37,440 per year or $720 per work week. APP412-414, 467. Elliott understood that the salary she received for a given pay period was compensation for hours worked during that pay period. APP235. At that time, Elliott's title was changed to Accountant/Human Resources, although Elliott contends she uses many different titles. APP257, 412-414, 467.

In or around March of 2012, a little over six months after starting work at TGF, Elliott received a raise in salary to $42,000 per year. *Id*. Beginning with her second pay period for August 2012, Elliott received a $25 per month increase in her salary continuing until her termination in March of 2013. *Id*. Elliott contends the monthly increase in pay was authorized by Eskridge in response to her request for a pay raise. APP260-261. Eskridge denies knowledge or approval of the raise, learning of these monthly raises only after Elliott's termination. APP412-

414. Nevertheless, beginning in January of 2012 and continuing throughout her employment with TGF, Elliott's pay was on a salary basis for an amount well in excess of $455 per week.

### 1. Elliott's work was directly related to the general business operations of TGF

As TGF's bookkeeper or Accountant/Human Resources, Elliott reported directly to Eskridge. APP412-414. Although, on occasion, other employees would assist with clerical aspects of Elliott's job, Elliott was solely responsible for, among other things, all aspects of TGF's accounts payable, accounts receivable, payroll, bank accounts, tax and payroll reporting and personnel records. *Id*.

Elliott's primary responsibilities, most of which are identified on her job description, included:

- handling all aspects of accounts payable. APP195-198.[3]
- resolving vendor disputes and credits. APP251.
- receiving and applying customer payments and credits. APP254-255.
- reconciling accounts receivable. APP223.
- handling collections (including passing of collections to TGF's outside legal services). APP224.[4]
- Accounting for all cash receipts, including reconciled for sales tax reporting. APP239-240.
- full payroll responsibilities, including entering, balancing, adjusting employee paychecks to reflect lunch hours that were worked and handling garnishment and remittance of payments related to child support. APP198-200, 266.

---

[3] Elliott testified that handling accounts payable involved a massive amount of paperwork in which purchasing would submit purchase orders, shipping and receiving would prepare a receiving report and then Elliott would compare those documents with invoices she received to check for any variations. APP195-198. If she identified no variations, she would proceed with paying a bill. *Id*. If there were variations, she would check with the manager over purchasing to determine if the bill could be paid. *Id*. Elliott handled this process alone, although at times, other employees would assist with matching and some alphabetizing. *Id*. TGF operated under three different payroll schedules, and Elliott was responsible for managing those schedules. APP225. She also responded to the request of several employees to switch from a hard copy pay check to direct deposit and researched this possibility. APP226-227, 255.

[4] Specifically, Elliott worked with Eskridge to go through the accounts receivable report and determine any overdue accounts. APP223 Per Eskridge's request, Elliott would then make calls and attempt to collect the money. In the event money could not be collected, after so many days, she would contact Prepaid Legal to send a demand letter. APP224.

- issuing pay checks or direct deposits of payroll. APP198, 144.
- making 941 deposits. APP200-201.[5]
- preparing and timely filing tax reports including 940, 941, SUTA, 1099 and W-2. APP412-414.[6]
- reconciling multiple bank accounts. APP208-213.[7]
- managing bank accounts including the transfer of funds and balance management. APP214, 265.[8]
- generating financial reports for the owner or at the request of TGF's outside accountants. APP215.
- managing spreadsheets for various customer accounts. APP216.[9]
- preparing sales tax reports and timely submitting related payments. APP216.222.[10]
- updating Quickbooks software for her department. APP208.
- handling the ordering of office supplies. APP264-265.

---

[5] At the beginning of Elliott's employment, there was a time in which she did not understand how to make the 941 deposits and she was required to consult with the TGF's outside certified public accountant about the process. APP200-201.

[6] Elliot admitted that filing of tax reports required her to keep up with deadlines and if she had questions regarding the process, she could call TGF's outside accountant to assist with the process. APP202-203; APP204-205 (regarding filing of SUTA – state unemployment tax – reports); APP205-206 (filing of 1099s); APP207 (filing of W-2s).

[7] Elliott reconciled TGF's bank account, savings or money market accounts, petty cash account, and one or two credit accounts. APP208-210. She had no assistance in reconciling the accounts other than inquiring with Eskridge about possible transfers. APP211. When she first began at TGF, the accounts were not necessarily reconciled, but she worked with the outside accountant to reconcile the accounts, and after working with the outside accountant, she was able to reconcile these multiple accounts for the remainder of her employment. APP212. In reconciling the accounts, she would handle any discrepancies in the accounts. APP213.

[8] Elliott admitted that only she and Eskridge had the authority to transfer funds in the accounts. APP213.In transferring funds, she would have to determine the balance and whether it was okay to move funds from the account. APP214. Funds were left in certain accounts due to a higher interest rate, but she made the decision about whether to transfer funds if needed to pay payroll. *Id*. Elliott further testified she reconciled credit card statements depending on her schedule and not necessarily every month. APP265.

[9] Elliott reconciled payments reflected in Quickbooks with those on various account spreadsheets. APP216. If a payment received from a customer and entered into Quickbooks was not reflected on the customer's spreadsheet, Elliott would make such an entry. *Id*.

[10] Elliott admitted that preparing the sales tax reports, at least initially, was a "nightmare" because cash had not been recorded in Quickbooks, but was reflected on accounts receivable APP216-217. Because it was her responsibility to pay the sales tax report, she wanted this issue to be resolved. APP218. In terms of sales tax, Elliott received notification from the State about paying sales tax either monthly or quarterly, and she would handle running any necessary reports and making payments timely. APP219. If there were not enough funds in the operating account to make the sales tax payment, she would make a decision to transfer the funds from TGF's money market account or savings account. APP219-220. During this process, if Elliott had a question she could ask the accountant, call the IRS, or call the State. APP220-221. Besides a few months in which a accountant was assisting her, Elliott was the one solely responsible for handling the sales tax reports. APP222.

- handling the reporting of a theft of cash and filing the claim with TGF's insurance company. APP238.
- handling human resources. APP77-78, 241-250; 412-414.[11]
- handling reimbursement of employee expenses. APP257-259, 310.

APP465. Even Kleinsmith testified that Elliott managed all the money, finances, paychecks, and that she was the nuts and bolts of TGF when it came to the money aspect. APP334-335.

### 2. Elliott exercised discretion and independent judgment with respect to matters of significance

Elliott further understood that her failure to file timely reports, including tax and sales tax reports, could have a significant financial impact on the company. APP245. In fact, during her employment with TGF, Elliott texted Eskridge to advise him that "today was an accounting nightmare and I saved you a ton of money." APP246-248, 298. This text message referenced Elliott's reconciling of the company's 2009, 2010 and 2011 sales tax issues. *Id.*

Elliott proposed changes to personnel policies, including TGF's Employee Handbook. APP412-414, 464. Elliott testified that she generated a new expense report to use for improved travel reimbursement. APP257-259, 310. Elliott also made suggestions regarding reimbursement of allowances for fuel and telephones, which Eskridge followed. APP157-158, 313. Sales representatives came to Elliott with questions related to customer payments. APP334-335. Elliott further participated in cross-training and trained another employee to handle payroll before her resignation date. APP234.1-234.2.

---

[11] Although Elliott contends that she was not familiar with human resources, she admits that she did accept that responsibility during her employment with TGF. APP256-257. Additionally, Elliott was responsible for maintaining the personnel files. APP241.243. She also was the person who handled new employee orientation in terms of completion of paperwork and any changes which employees might make to their personnel records. *Id.* If any employee changes resulted in any change of status for tax purposes, Elliott was responsible for adjusting payroll accounts to reflect those changes. APP241-243. Elliott handled employee termination documentation. APP77-78, 101. Elliott further admits that she handled filing responses to unemployment claims. APP249-250. She also prepared a revised employee handbook, Case Intake Agreement and Bonus Program, all significant policies for TGF's business. APP412-414.

Typically, Elliott worked alone in her office and no one sat there and oversaw her work. APP243. Although she had a schedule of certain things, she controlled her day-to-day activities. APP244-245.

After her departure from TGF, she advised Eskridge that "if you have any questions about my accounting practices, Ken's management decisions or [Miller]'s sales methods, I advise you to ask before jumping to conclusions. … You might not agree with every decision, but they were all done in a legal manner and with the highest level of ethics." APP252-253, 286.1.

**D.     Miller and Elliott's Termination from Team Go Figure**

On or about February 2013, Miller and Elliott turned in their resignation notices to TGF. APP414. Before providing notice and unbeknownst to TGF, Elliott, Miller and TGF's Production Manager, Scott "Ken" Kenworthy made plans to form a competing company – Texas Motions Sports, now located in Rockwall, Texas. APP370-372.

Shortly thereafter, Eskridge learned that Elliott issued payroll checks to herself and Miller for payment of vacation days for Year 2013 in the amounts of $1050 and $2,148.16. APP414, 445, 463. She also issued automobile and cell phone reimbursements of $200 and $100, less deductions. *Id*. Upon learning of the unauthorized payments, Eskridge terminated Miller and Elliott, effective March 4, 2013. *Id*.

On April 18, 2013, Miller, Elliott, Kleinsmith, and Antwan Lee[12] filed this lawsuit. Dkt. 1. At no time during their employment did Miller or Elliott complain that they were not properly classified as exempt from overtime or that they should be entitled to overtime pay. APP414.

**E.     Kleinsmith's Employment History with Team Go Figure**

---

[12] Antwan Lee voluntarily dismissed his claims on August 8, 2008, Dkt. 12.

Kleinsmith interviewed for and was hired as an outside sales representative for TGF for a period of less than four months, beginning January 19, 2012 until she walked off the job on May 17, 2012. APP155, 191, 415-416. Miller was Kleinsmith's supervisor, as well as the other sales representatives. APP333, 343.1, 344-345, 355.1.

TGF hired Kleinsmith to handle one of the local DFW sales territory. APP322, 415-416. Because of her close proximity (as opposed to outside sales representatives in other Texas territories), Kleinsmith utilized TGF's offices in Garland, where she reported to work when not making outside sales calls. APP415-416. During her office time, she would send out e-mails to directors or coaches of schools to set up an opportunity to meet with them. APP317. These scheduled meetings were for the purposes of generating a sale. APP320, 330. She spent about 50% of her time "out" "doing sales" and 50% in the office. APP335.3.

Her primary responsibility was making sales by setting up appointments and meeting with directors of dance, drill and cheer teams in her DFW sales territory. APP332, 340, 415-416. Kleinsmith testified as follows:

> Q:  And was your primary job function to make sales?
>
> A:  Yes, but no. I would say that our objective was to make sales, but I also was to provide customer service. And I was to provide marketing. So anytime that we did any events, like we did TMEA, I would help with those events and coordinate what the booth would look like with Toni. And I also helped with the catalog and helping Toni design some of the catalog and pictures and things like that, making sure that equipment was properly for color guard and things like that because that's where my expertise was held.

APP317.

In fact, Kleinsmith admitted that in her role at TGF she was responsible for the following:

- Canvasing her sales territory for new clients. APP346.1.
- Setting up new clients in the Quickbook system. *Id.*

15

- Maintaining garment racks (for displaying products at outside sales meetings. *Id*.
- Maintaining hangers and sales samples. APP415.
- Increasing sales in her territory. APP346.2.
- Submitting sales reports. APP346.3.
- Updating contacts and appointments. *Id*.
- Reporting problems or concerns expressed by her customers. *Id*.
- Communicating customer ideas or new products to the Sales Manager. *Id*.
- Inputting data into spreadsheets and providing copies to the home office. *Id*.
- Providing copies of order forms from fittings. *Id*.
- Preparing invoices and purchase orders for production and notifying TGF immediately when ready for processing. APP346.5.

These are the duties of an outside sales representative, as stated on the TGF job description. APP415-416, 468. Kleinsmith worked outside the office to meet with customers to make sales for TGF. APP415-416. Further, Kleinsmith believes that she signed an agreement in which she would receive 5% of sales and admitted that one of her primary duties was to increase sales in her territory. APP331-332.

Kleinsmith was assigned a specific sales territory. APP415-416. Kleinsmith admitted that one of the purposes of her job was to find new folks, new schools in her territory and one of the ways that she did this was by scheduling a face-to-face meeting with directors. APP326, 333.2-333.3, 356. She further understood that she was making contacts by phone or e-mails with the directors so she could go out and meet them face-to-face and make a sale. APP327-328, 357. Kleinsmith would make appointments for outside the office, and would leave the office to show apparel and items. APP317, 319-320. The purpose of Kleinsmith's sales calls were to show the customer items they had ordered in the past and new products that had been updated for the new year's catalog so that a sale could be made. APP320. Kleinsmith would leave the office for 2 to 3 hours a day, Monday through Friday, making sales calls. *Id*.

Additionally, Kleinsmith worked outside of the office to attend fittings, which were also a sales opportunity. APP321, 415-416. Kleinsmith understood that making face-to-face contact

16

with a director would help her with future sales. APP330. Kleinsmith contends that "fittings were not sales meetings. However, Kleinsmith herself provided an example in which she was at a fitting and was able to meet with a director from a different school and land that school as a new customer. APP339-340.

During Kleinsmith's employment, she received a written warning from Miller regarding performance issues. APP343.1, 355.1, 415-416. A decision was made to terminate Kleinsmith because she represented she was going to Oklahoma for sales appointments, which she never attended. APP144.1, 415-416. On or around May 17, 2012, with her termination pending, Kleinsmith resigned from her employment with TGF. APP415-416. After her employment with TGF ended, Kleinsmith represented herself as being a "sales rep" and for "nurturing established territory accounts and opening new accounts on a weekly basis." APP277-278. Kleinsmith explained that she accomplished this goal by selling to the directors of schools in her territory. *Id*.

## III.     ARGUMENT & AUTHORITIES

### A.     Summary Judgment Standards

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Duffie v. U.S.*, 600 F.3d 362, 371 (5th Cir. 2010).

When a defendant moves for summary judgment on the basis of an affirmative defense and, thus, bears the ultimate burden of persuasion, "it must adduce evidence to support each element of its defenses and demonstrate the lack of any genuine issue of material fact with regard thereto." *Rushing v. Kan. City S. Ry. Co.*, 185 F.3d 496, 505 (5th Cir. 1999); *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Cantu v. Jackson Nat'l Life Ins. Co.*, 579 F.3d 434, 438 (5th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings, but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *Smith ex rel. Estate of Smith v. Unites States*, 391 F.3d 621, 625 (5th Cir. 2004). The evidence must be construed "in the light most favorable to the non-moving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.*, 98 F.3d 179, 181 (5th Cir. 1996). However, "unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown v. City of Hous.*, 337 F.3d 539, 541 (5th Cir. 2003); s*ee also McCowin v. Schwerman Trucking Co.* No. 6:08-cv-421, 2010 U.S. Dist. LEXIS 91408, at *6 (E.D. Tex. Sept. 2, 2010) ("The nonmovant's burden may not be satisfied by argument, conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a mere scintilla of evidence.").

A court must grant summary judgment if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to their case on which they bear the

burden of proof at trial. *Wenner v. Tex. Lottery Comm'n*, 123 Fed 321, 324 (5th Cir. 1997), cert. denied, 523 U.S. 1073 (1998).

>   **B.     Requirements Under The Fair Labor Standards Act**

The FLSA requires any nonexempt employee working over forty hours in a week to be paid overtime compensation at the rate of one and one-half times her regular rate of pay. 29 U.S.C. § 207(a)(1); *York v. City of Wichita Falls,* 48 F.3d 919, 921 (5th Cir. 1995); *see also Singer v. City of Waco*, 342 F.3d 813, 818 (5th Cir. 2003). An employer who knows or should know that an employee is working overtime must comply with the provisions of the FLSA. *Harvill v. Westward Commc'ns, LLC*, 311 F. Supp. 2d 573, 583 (E.D. Tex. 2004) *aff'd*, 433 F.3d 428 (5th Cir. 2005) (citing *Newton v. City of Henderson*, 47 F.3d 746, 748 (5th Cir. 1995)). However, an employee who brings suit for unpaid overtime compensation under the FLSA bears the burden of proving, with definite and certain evidence, that he or she performed work for which they were not compensated properly. *Harvill*, 311 F. Supp. 2d at 583; *Karr v. City of Beaumont*, 950 F. Supp. 1317, 1321 (E.D. Tex. 1997); *Duplessis v. Delta Gas, Inc.*, 640 F. Supp. 891, 895 (E.D. La. 1986).

An employee is exempt from overtime if they are employed in a bona fide executive, administrative, or professional capacity. 29 U.S.C. § 213)(a)(1); *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 584 (5th Cir. 2006). The employer bears the burden of proving that the employee is exempt from overtime requirements. *Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 402 (5th Cir. 2002) (citing *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1224 (5th Cir. 1990)). The "ultimate decision whether an employee is exempt from the FLSA's overtime compensation provisions is a question of law." *Cheatham*, 465 F.3d at 584 (quoting *Lott v. Howard Wilson Chrysler Plymouth, Inc.*, 203 F.3d 326, 331 (5th Cir. 2000)).

>   **C.     Executive Exemption Requirements**

An employee is employed in an executive capacity if (a) the employee is compensated at a rate of more than $455 per week, (b) her primary duty is the management of the enterprise or a customarily recognized department thereof, (c) the employee customarily directs the work of two or more employees, and (d) the employee has the authority to hire and fire other employees or their suggestions and recommendations with regard to hiring, firing or other change of status of other employees are given particular weight. 29 C.F.R. § 541.100(a)(1)-(4).

### 1.      Compensation

Miller was paid a rate of more than $455 per week. APP153, 409-412. Miller was initially hired at a starting annual salary of $78,000 per year, equating to $1,500 per work week, well in excess of $455 per week. This factor is not in dispute, and in the interest of judicial economy, will not be addressed. TGF, however, reserves the right to address Plaintiffs' salary and compensation in their reply should Plaintiffs attempt to dispute that they were paid at a rate of less than $455 per week.

### 2.      Primary duty

Courts generally consider four non-exclusive factors with respect to whether an employee's primary duty is management of the enterprise or a customarily recognized department. *See Vela v. City of Hous.*, 276 F.3d 659, 677 (5th Cir. 2001). The factors to be considered are (1) the relative importance of the managerial duties as compared with other types of duties, (2) the frequency with which the employee exercises discretionary powers, (3) the employee's freedom from supervision, and (4) the relationship between the employee's salary and wages paid to other non-exempt employees. *Id.*

"Generally, 'management' includes, but is not limited to, activities such as interviewing, selecting and training employees; setting and adjusting their rates of pay or hours of work; directing the work of employees; maintaining production or sales records for use in supervision

or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning work; determining the techniques to be used; apportioning the work among employees; determining the type of materials, supplies, machinery or equipment or tools to be used or merchandise to be bought, stocked or sold; controlling the flow and distribution of materials or merchandise and supplies; providing safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures." 29 C.F.R. § 541.102. This is a non-exhaustive list of the duties characteristic of "management." An employee need not perform each of these duties, or even a majority of them. *Rubery v. Buth-Na-Bodhaige, Inc.*, 470 F. Supp. 2d 273, 276 (W.D.N.Y. 2007).

It is well-settled that performing some non-exempt work does not preclude an employee from being exempt. *See* 29 C.F.R. § 541.106 ("concurrent performance of non-exempt work does not disqualify an employee from the executive exemption if the requirements of § 541.100 are otherwise met."); *Murray v. Stuckey's, Inc.*, 939 F.2d 614, 618 (8th Cir. 1991); *see also Dalheim*, 918 F.2d 1220, 1227 (5th Cir. 1990); *Kastor v. Sam's Wholesale Club*, 131 F. Supp. 2d 866-67 (N.D. Tex. 2001); *Marshall v. Sally Beauty Co.*, No. 80-4138, 1982 U.S. Dist. LEXIS 13604, at *10 (E.D. La. April 19, 1982) ("The performance of non-managerial duties does not mandate a finding that the managers are not principally responsible for the management of the stores."); *Stein v. J.C. Penney Co.*, 557 F. Supp. 398, 404 (W.D. Tenn. 1983).

Indeed, the specific amount of time spent performing exempt work is not dispositive of whether that work is an employee's primary duty. 29 C.F.R. § 541.700(b); *Schwind v. EW & Assocs.*, 357 F. Supp. 2d 691, 703 (S.D.N.Y. 2005) ("'[T]ime alone . . . is not the sole test' and

an employee 'may nevertheless have management as his primary duty if the other pertinent factors support such a conclusion.'"). In *Kastor v. Sam's Wholesale Club*, 131 F. Supp. 2d 862 (N. D. Tex. 2001), in discussing whether a bakery manager at Sam's Wholesale was exempt from overtime, the court stated that it was unpersuaded by the manager's attempt to minimize his responsibilities by arguing that he spent 10% of his time performing managerial tasks because it in no way established that management was not his "primary duty." *Id.* at 866-67. An employee's primary duty is what [the employee] does that is of *principal value* to the employer, not the collateral task that [the employee] may also perform, even if they consume more than half [the employee's] time. *Dalheim*, 918 F.2d at 1227; *see also* 69 Fed. Reg. 22122, 22186 (Apr. 23, 2004) (federal courts "have found many employees exempt who spent less than 50 percent of their time performing exempt work").

Based on the actual duties performed, courts determine whether the employee is exempt, applying relevant regulations and interpretations. *See Dalheim,* 918 F.2d at 1225. A court may find that an employee is exempt if it finds that she performed a combination of these duties covered by the exemptions. 29 C.F.R. § 541.708. In *Posely v. Eckerd Corp.*, for example, managers of Eckerd stores were found exempt even though they often performed managerial and non-managerial tasks concurrently and performed non-exempt tasks "to teach by example." *Posely v. Eckerd Corp.*, 433 F. Supp. 2d 1287, 1306 (S.D. Fla. 2006). The court held that the case law is "replete with decisions holding [retail managers] to be exempt, notwithstanding the fact that they spent the majority of their time performing non-exempt tasks or they need to obey corporate policies and/or follow the orders of the corporate superiors." *Id.* at 1302. In reaching its decision, the court noted that on a day-to-day basis, the managers were charged with handling their individual stores' customer relations, appearance, loss prevention, and cash intake while

maintaining a significant amount of control over store personnel, and frequently exercise discretion to fulfill their duties. *Id.* at 1303. Similarly, in *Mims v. Starbucks Corp.,* local managers were held to be exempt executives even though they spent 70-80 percent of their time performing non-exempt duties, because they simultaneously performed managerial tasks, such as serving as "role model," observing subordinates' performance, giving feedback, and recommending promotions and terminations. *Mims*, U.S. Dist. LEXIS 9, at *19-20 (S.D. Tex. Jan. 2, 2007).

### 3.     Customarily directs work of two or more employees

The third requirement of the executive exemption test focuses on the employee's supervision of others. In assessing an employee's supervisory role, the fact she may be subject to the direct supervision of a more senior supervisor is not determinative. Rather, the inquiry focuses on whether the employee herself customarily and regularly directs the work of others. *See Thomas v. Speedway SuperAmerica, LLC*, 506 F. 3d 496, 507 (6th Cir. 2007) (employee need not have "complete freedom from supervision … as this would disqualify all but the chief executive officer from satisfying this factor of the primary duty inquiry"); *Aquirre v. SBC Commc'ns, Inc.*, No. H-05-3198, 2007 U.S. Dist. LEXIS 72666, at*69-70 (S.D. Tex. Sept. 30, 2007) (eight call center managers exempt despite being subject to direct supervision by immediate supervisor); *Murray v. Stuckey's Inc.,* 50 F. 3d 564, 570 (8th Cir. 1995) (company standardized procedures and policies and "active supervision and periodic visits by a regional manager [did] not eliminate the day-to-day discretion of the on-site store manager").

The Department of Labor's ("DOL") Preamble to the revised exemption regulations provides that the term "customarily and regularly" requires a case-by-case determination based on all the facts and circumstances over a time period of sufficient duration to exclude anomalies. *See e.g.*, W.H. Op. Ltr., 1992 WL 845098 (Aug. 20, 1992) (an analysis should be "over a

significant time span, especially in smaller organizations … to eliminate the possibility of significant cycles in work requirements and to support that there are sufficient exempt duties on a week-in-week-out basis to support the exemption claimed"). The case-by-case determination addresses times when an exempt manager directs fewer than two employees.

In *Kastor,* in determining whether a bakery manager "regularly and customarily directed the work of two or more employees," the court held that the manager directing the work of employees 70-75% of the time was sufficient to establish the customary and regular direction of the work of two or more employees. *Kastor*, 131 F. Supp. 2d at 866-67. It is important to note that the DOL has expressly rejected any bright-line test tying an employee's "primary duty" to a specific percentage of the employee's hours. 29 C.F.R. § 541.700(b). Indeed, the *Kastor* standard does not require that an exempt executive must spend a certain percent of her time performing management duties. *Kastor* provides direction in situations in which an exempt manager directs fewer than two employees, and whether over a significant time span, the supervisor has met the "customarily and regularly" requirement. *Kastor*, 131 F. Supp. 2d at 866-67.

### 4. Authority to hire and fire or particular weight given to recommendations and suggestions

The fourth and final requirement of the executive exemption test focuses on the manager's ability or authority to influence the employment status of subordinates. The regulations recognize the distinction between ultimate decision-making authority to hire and fire and the ability to *influence* hiring and firing decisions and provide that "employee whose suggestions and recommendations as the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight" may also be deemed exempt. 29 C.F.R. § 541.100.

In *Gellhause*, plaintiff, a former assistant manager for defendant, filed suit alleging she was entitled to overtime pay. *Gellhaus v. Wal-Mart Stores, Inc.*, 769 F. Supp. 2d 1071, 1073 (E.D. Tex. 2011). Defendant moved for summary judgment asserting that Plaintiff was exempt from the FLSA under the executive exemption. *Id*. at 1074. At issue was the whether the employee had the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. *Id*. at 1081-82. The court stated that an employee's suggestions may still have weight even if a higher manager's recommendation has more importance, and even if the employee does not make the ultimate determination. *Id*. at 1081. Plaintiff testified that interviewing and hiring employees and conducting "employee coaching" were part of her duties as an assistant manager. *Id*. at 1082. Further, the plaintiff was tasked with disciplining employees by issuing written or verbal warnings. *Id*. The Store Manager testified that she regularly followed plaintiff's recommendations. *Id*. Accordingly, the court held that plaintiff met the final prong of the executive exemption, and therefore, granted defendant's motion for summary judgment. *Id*. at 1083.

### D.     Miller Falls Within the Executive Exemption and Therefore is Not Entitled To Overtime

Miller is exempt from overtime because she was employed in an executive capacity. Miller was paid a salary of more than $455 per week, her primary duties included the management of the sales department, including the supervision of two or more employees, and her suggestions regarding hiring and firing were given particular weight.

### 1.     Miller was paid a salary of over $455 per week

Miller was initially hired at a starting annual salary of $78,000 per year, equating to $1,500 per work week, well in excess of $455 per week. Thus, the first exemption factor is met.

25

### 2. Miller's primary duty was management of recognized departments

It is undisputed that Miller's primary duty was the management of a customarily recognized department at TGF. Employees with similar duties have been held exempt from overtime requirements. *See*, e.g., *Murray v. Stuckey's, Inc.*, 939 F.2d 614 (8th Cir. 1991); *Donovan v. Burger King Corp.*, 675 F.2d 516 (2d Cir. 1982 (assistant managers at retail food chain); *Rainey v. McWane, Inc.*, 552 F. Supp. 626 (E.D. Tex. 2008); *Kastor v. Sam's Wholesale Club*, 131 F. Supp. 2d 862 (N.D. Tex. 2001) (department manager exempt because primary duty was management as a matter of law); *Thomas v. Jones Restaurants, Inc.*, 64 F. Supp. 2d 1205 (M.D. Ala. 1999); *Lyles v. K-Mart Corp.*, 519 F. Supp. 756 (M.D. Fla. 1981) (assistant manager of retail discount store).

As the Sales Manager, Miller's primary responsibility was directing and supervising outside sales representatives and the sales assistant and overseeing the various sales territories in Texas. She not only monitored the sales efforts of her team, but also provided guidance in terms of working with existing and prospective customers. She travelled with her sales teams to customer appointment in which her representatives need additional direction. In overseeing the various sales territories, Miller handled the larger "house accounts" working to keep customers satisfied.

### 3. Miller's primary duty included the supervision of two or more employees

Miller admits that she supervised the outside sales representatives and Tabitha Corker, the Sales Assistant. Kleinsmith also testified that Miller supervised her, as well as anyone who did sales. Although there were a few weeks during Miller's management in which TGF employed only one sales representative, Miller was also supervising graphic designers. Nevertheless, during 111 weeks of Miller's 147 weeks of employment at TGF, TGF employed at

26

least two or more full-time outside sales representatives or assistants. Therefore, through Miller's own admission she supervised two or more employees at least 76% of her employment which is sufficient to establish the customarily and regularly requirement. For these sales representatives, among other things, she monitored their sales, appointments and fittings, offered direction and supervision, provided training, guidance and even verbal and written disciplinary action. She thus meets the third element of the executive exemption.

### 4.   Miller's recommendations with regard to hiring, firing or other change of status were given particular weight

Miller was heavily involved in the process of hiring, firing, advancement, and promotion of employees. APP409-412. Miller participated in the interview process of her sales team. Even though Miller contends Eskridge made the ultimate hiring and firing decisions, the input and recommendations of Miller were given particular weight. *Id*. Miller also had responsibility for coaching and disciplining employees leading up to potential termination, as Miller gave both verbal and written warnings to employees who were not performing their job appropriately. *Id*. That is all the authority that is required for the exemption. 29 C.F.R. § 541.100(a)(4). As a result, Miller meets all of the factors rendering her exempt from overtime because she was employed in a bona fide executive capacity.

### E.   The Administrative Exemption Requirements

An employee is employed in an administrative capacity if (a) the employee is compensated at a rate of at least $455 per week, (b) the employee's primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer, and (c) their primary duty includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200(a)(1)-(3).

### 1.    Compensation

This factor is not in dispute, and in the interest of judicial economy, will not be addressed. Defendants, however, reserve the right to address Plaintiffs' salary and compensation in their reply should Plaintiffs attempt to dispute that they were paid at a rate of less than $455 per week.

### 2.    Work directly related to the management or general business operations of the employer

The second part of the administrative exemption is having a primary duty of performing office or non-manual work relating to the management or general business operations of the employer. "Primary duty" means the "principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). In determining what an employee's primary duty consists of, the key inquiry is the "character of the employee's job as a whole." *Id.*

Factors to consider include, but are not limited to:

- the relative importance of the exempt duties as compared with other types of duties;
- the amount of time spent performing exempt work;
- the employee's relative freedom from direct supervision; and
- the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id.* Although the amount of time spent performing exempt work is a "useful guide," time alone "is not the sole test and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work." 29 C.F.R. § 541.700(b). Nonetheless, employees "who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement." *Id.*

28

The phrase "directly related to the management or general business operations" refers to the type of work directly performed by the employee. To meet this requirement, an employee should perform work directly related to assisting with the running or servicing of the business in issue (as distinguished, for example, from working on a manufacturing production line). *See* 29 C.F.R. § 541.201(a); 69 Fed. Reg. 22140 (April 23, 2004); *see also* 29 C.F.R. § 541.205(b) ("The [exempt] administrative operations of the business include the work performed by so called white collar employees engaged in 'servicing' a business, as, for example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control.").

If an employee's primary duty is marketing — a duty explicitly recognized by the regulations as "directly related to the management or general business operations" — then the employee qualifies for the administrative exemption. 29 C.F.R. § 541.201(b). Indeed, the DOL's 2004 regulations provide that a financial services industry employee whose primary duty is selling financial products does *not* qualify for the administrative exemption, but that such employees generally are exempt if their duties include "collecting and analyzing information regarding the customer's income assets, investments or debts; determining which financial products best meet the customer's needs and circumstances; advising the customer regarding the advantages and disadvantages of different products; and marketing, servicing and promoting the employer's products." 29 C.F.R. § 541.203; *see also Hein v. PNC Fin. Servs. Group Inc*., 511 F. Supp. 2d 563 (E.D. Pa. 2007) (holding that a senior financial consultant is administratively exempt even though his duties including makes sales); W.H. Op. Ltr., FLSA 2006-43 (Nov. 27, 2006) (addressing the exempt status of registered representatives).

### 3.   The exercise of discretion and independent judgment with respect to matters of significance

29

Finally, an exempt administrative employee's duties should also "include the exercise of discretion and independent judgment with respect to matters of significance." *See* 29 C.F.R. § 541.200(a)(3). The use of the term "includes" is significant. Under the old regulations, some courts applied a standard that an exempt administrative employee must "customarily and regularly" exercise discretion and independent judgment. However, in the Final Rule, the DOL used the term "includes," and the Secretary (though the Preamble) clarified that the administrative exemption does not require the exercise of discretion and independent judgment "customarily and regularly" as some courts had once thought:

> The requirement that the primary duty must "include" the exercise of discretion and independent judgment – rather than "customarily and regularly" exercise discretion and independent judgment – is not a change from current law. Although the Department is aware that there has been some confusion regarding the appropriate standard under the existing "short" duties test, federal court decisions have recognized that the current "short" duties test does not require that the exempt employee "customarily and regularly" exercise discretion and independent judgment, as does the effectively dormant "long" test. *See*, *e.g.*, *O'Dell v. Alyeska Pipeline Service Co.*, 856 F.2d 1452, 1454 (9th Cir. 1988) (district court erred in not applying more lenient "includes" standard under short test which made a difference in determining whether employee was exempt); *Dymond v. United States Postal Service*, 670 F.2d 93, 95 (8th Cir. 1982) (while the "long" duties test for the administrative exemption requires that the employee "customarily and regularly" exercise discretion and independent judgment, when an employee makes more than $250 a week, "that requirement is reduced to requiring that the employee's primary duty simply 'includes work requiring the exercise of discretion and independent judgment'").

69 Fed. Reg. 22142-43 (April 23, 2004). Given this classification, the amount of time an exempt administrative employee must spend exercising discretion and independent judgment is something less than "customarily and regularly."

Thus, according to the regulations, the definition of "customarily and regularly" means "a frequency that must be greater than occasional but which, of course, may be less than constant."

29 C.F.R. § 541.701. In fact, the DOL has issued an opinion letter clarifying that a task performed as little as "one or two hours a day, one or two times a week" is performed "customarily and regularly." *See* W.H. Div. Op. Ltr. 2007-2 (January 25, 2007). Accordingly, an employee who exercises discretion and independent judgment "one or two hours a day, one or two times a week" meets the "includes" standard for the administrative exemption. *Id.*

As it is used here, exercising discretion and independent judgment involves "the comparison and the evaluation of possible courses of conduct, and acting or making a decision after various possibilities are considered." 29 C.F.R. § 541.202(a). In addition, the exercise of discretion and independent judgment may result in "recommendations for action rather than the actual taking of action." 29 C.F.R. § 541.202(c). Indeed, "employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a high level." *Id.* "The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment." *Id.*; *see also Dymond v. U.S. Postal Serv.*, 670 F.2d 93, 96 (8th Cir. 1982) (discretion to make a recommendations can suffice); and *Gallegos v. Equity Title Co. of Am., Inc.*, 484 F. Supp. 2d 589, 596 (W.D. Tex. 2007) (noting that the decisions may "consist of recommendations for action rather than the actual taking of action").

The regulations also require that the exempt administrative employee exercise her discretion with respect to "matters of significance." This term "refers to the level of importance or consequence of the work performed." 29 C.F.R. § 541.202(a). Although not further defined in the regulations, the Preamble to the Final Rule states that "the work performed by an exempt administrative employee must be significant, substantial, important, or of consequence." 69 Fed. Reg. 22143 (April 23, 2004) (citing *Piscione v. Ernst & Young, LLP*, 171 F.3d 527, 535-43 (7th

31

Cir. 1999)). Accordingly, the discretion and independent judgment standard must be applied in light of all of the facts in a particular employment situation and, under 29 C.F.R. § 541.202(b) factors to consider when making this determination include, but are not limited to, whether the employee:

- has authority to formulate, affect, interpret, or implement management policies or operating practice;
- carries out major assignments in conducting the operations of the business;
- performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business;
- has authority to commit the employer in matters that have significant financial impact;
- has authority to waive or deviate from established policies and procedures without prior approval;
- has authority to negotiate and bind the company on significant matters;
- provides consultation or expert advice to management;
- is involved in planning long or short-term business objectives;
- investigates and resolves matters of significance on behalf of management; and
- represents the company in handling complaints, arbitrating disputes or resolving grievances.

Moreover, the Preamble to the Final Rule notes that federal courts generally find that employees who meet at least two or three of these factors exercise discretion and independent judgment. *See* 69 Fed. Reg. 22143 (April 23, 2004) (citing cases). The Preamble also states that federal courts have found the following relevant in assessing whether an employee exercises discretion and independent judgment:

- freedom from direct supervision;
- personnel responsibilities;
- troubleshooting or problem-solving activities on behalf of management;
- use of personalized communication techniques;
- authority to handle atypical or unusual situations;
- responsibility for assessing customer needs;

- primary contact to public or customers on behalf of the employer;
- duty to anticipate competitive products or services and distinguish them from competitor's product or services;
- advertising or promotion work; and
- coordination of departments, requirements or other activities on behalf of the employer.

*See id.* at 22144 (emphasis added). "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). The phrase 'discretion and independent judgment' must be applied in the light of all the facts involved in the particular employment situation in which the question arises." 29 C.F.R. § 541.202(b).

**F.    Miller Falls Within the Administrative Exemption and Therefore is Not Entitled To Overtime**

Miller meets the test for the administrative exemption, which is sufficient to render her exempt from overtime independently of the executive exemption. Miller's primary duty was the performance of non-manual work directly related to the management of TGF's business and included the exercise of discretion and independent judgment in matters of significance.

In *Pendergraft*, a former corporate account administrator filed suit against Defendant alleging willful violation of the FLSA. *Pendergraft v. Fujitsu Network Communs., Inc.*, No. 3:10-CV-2047-L, 2011 U.S. Dist. LEXIS 96146, at *2 (N.D. Tex. Aug. 26, 2011). Plaintiff contended that her employment position was improperly characterized as exempt under the FLSA because her job duties were not "administrative." *Id.* Defendant moved for summary judgment asserting plaintiff met all the criteria to be an exempt employee pursuant to the administrative exception. *Id.* at *3. The court determined that customer oriented duties were, without question, directly related to the general business operations of her employer. *Id.* at *8.

33

Further, the court was unpersuaded that plaintiff was unable to exercise any discretion or judgment merely because she had to have approval. *Id*. at *10. Instead, the court noted that: "plaintiff may have been limited, but her ability to interact, and her methodology of interacting with defendant's customers was not limited to that of an automaton." *Id*. at *11. The court found that interacting with customers was a malleable process, requiring attentiveness, reactiveness, and discerning—all of which encompass discretion. *Id*. at *11-12. Therefore, the court granted defendant's motion for summary judgment, finding that plaintiff was an exempt employee under the administrative exception. *Id*. at *12-13.

Miller's job duties at TGF were heavily customer oriented. Miller provided guidance and direction to associates regarding customer service and frequently dealt with customers and customer complaints. In fact, Miller admitted that she was partly hired to work with and address customer complaints. Although Miller may have sought approval in some instances, her ability to interact, and her methodology of interacting with customers was not limited to that of an automaton. *See Pendergraft*, 2011 U.S. Dist. LEXIS at *11.

### 1. Miller was paid a salary of more than $455 per week.

As discussed above, it is undisputed that Miller's annual salary of $78,000 was more than $455 per week.

### 2. Miller performed non-manual work related to Team Go Figure's management or general operations.

Miller performed non-manual work related to management. She assisted with the running of the business and her duties as Sales Manager incorporated many of the functional areas of TGF's business including marketing, personnel management, representing the company, customer service and promotion of sales. 29 C.F.R. 541.201. In fact, Miller contends that separate and apart from her role as Sales Manager, she was hired to handle "promotion"

"customer service" or marketing of the company. 29 C.F.R. 541.205(b). Such responsibilities, whether performed under the title of "Sales Manager" or otherwise, are directly related to the general business operation of TGF and fall within the administrative exemption. Specifically, in her words, she was hired to put a shiny happy face on TGF and did everything in that regard.

### 3. Miller exercised discretion and independent judgment.

Miller's primary duties as Sales Manager, included the daily exercise of judgment and discretion, from delegating work to handling customer and employee complaints to actively participating in promotion events. *See McKee v. CBF Corp.*, No. 3:06-CV-1629-G, 2008 U.S. Dist. LEXIS 22091, at *10 (N.D. Tex. March 19, 2008), *aff'd*, 299 Fed. Appx. 426 (5th Cir. 2008) ("It appears, from the evidence in the record, that McKee was given the discretion and judgment to make decisions without immediate supervision.").

Whether Miller had final decision-making authority on every item is of no moment. *See Cheatham*, 465 F.3d at 585 ("decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action."); *see also* 29 C.F.R. § 541.202(c) ("employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level."). The fact that Miller has claims she had to seek approval from TGF's owner in some situations does not preclude a finding that she is an exempt employee.

In affirming the district court's conclusion that the employee was exempt, Fifth Circuit made clear:

> "[t]he decision made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action." 29 C.F.R. § 541.207(a). The district court determined that, in seeking approval, Appellants were expected to make a recommendation based on their experience and knowledge of the case and to explain their reasons for recommendation.

35

*Cheatham,* 465 F.3d at 585-86. There is nothing in the record to suggest that TGF's guidelines or approval process in any way prevented Miller from exercising independent judgment or discretion.

Miller testified she was the person through whom "everything filtered" through in terms of sales and creative director. APP25. Just as in *Cheatham*, Miller, as the primary point of contact for TGF's customers, sales representatives and design team and she had the direct experience and knowledge of all relevant factors for consideration that her recommendation she would take to management for a final approval. Miller therefore exercised independent judgment and discretion with regard to matters of significance, and was doing so in a manner that was directly related to the management or general business operations of TGF's business.

In *Verkuilen v. Mediabank,* the court granted the defendant's motion for summary judgment and held that an account/customer consultant ("ACC") was exempt when her primary duty was to act as a liaison between the employer and its customers and facilitate their use of the employer's products. *Verkuilen v. Mediabank, LLC*, No. 09-C-35-27, 2010 U.S. Dist. LEXIS 77407, at *3 (N.D. Ill. July 27, 2010). The court specifically examined whether the employee's duties involved comparing and evaluating possible courses of conduct and acting or making a decision after considering the various possibilities and determined that ACC's duties involved this comparison and evaluation. *Id.* at *6. The court found that the ACC was not merely using her skill set within a rigid system. *Id.* at 7. While there were company policies for her to follow and that her work was channeled by these standards, the court found the ACC possessed discretion and used independent judgment in deciding how to address clients' problems. The court held that the employer's relationships with its clients were very important and that the

ACC's duty was to resolve any client problems and to keep the clients happy. Concluding the ACC was administratively exempt, the court noted that it had:

> … No difficulty concluding that plaintiff exercised discretion and independent judgment with respect to matters of significance … [the ACC] represented her employer in its relationships with customers … [ACC's] primary duty was to act as a liaison between [the employer] and its customers to facilitate customers' use of the software.

*Id.* at *5, 8 and 11. Like the ACC in *Verkuilen*, Miller is administratively exempt because her primary duty was to act as a liaison between TGF and its customers, and she exercised discretion and independent judgment in matters of significance.

### G. Elliot was Administratively Exempt and Therefore Not Entitled to Overtime

Elliott's primary duty was the performance of non-manual work directly related to the general business operations of TGF and included the exercise of discretion and independent judgment in matters of significance.

### 1. Beginning in March of 2012 Elliott's annual salary was more than $455 per week

Elliott was initially hired as an hourly employee, not because TGF did not consider her exempt but so TFG could observe her hours and work ethic. APP412-414. In January of 2010, after approximately five months of employment, TGF was paying Elliott an annual salary of $37,440 per year. Two months later her salary was raised to $42,000. Then she received raises of $25 each month beginning in August of 2012 until her termination.

### 2. Elliott performed non-manual work related to Team Go Figure's management or general operations

Elliott performed non-manual work related to the general operations of TGF. Specifically, she ran all matters related to payroll, accounts payable, accounts receivable, management of TGF's bank accounts, and payment of vendor invoices. Her work comprised the

overwhelming majority of the administrative duties and responsibilities needed to run accounting and back office business of TGF. She also handled all aspects of human resources, including personnel files, policy drafting, termination documentation and unemployment claims.

Elliott testified that she performed a substantial portion of all of the duties listed on her job description. APP465. This is telling, as a general job description prepared by the employer should be considered when making the determination of whether an employee qualifies for an exemption under the overtime provisions of the FLSA. *Bullard v. Babcock & Wilcox Tech. Servs. Pantex, L.L.L.*, No. 07-CV-049-J, 2009 U.S. Dist. LEXIS 50906 (N.D. Tex. 2009), *judgment vacated on other grounds by Strokes v. BWXT Pantex*, LLC, 424 Fed. Appx. 324 (5th Cir. 2011).

The laundry list of Elliott's admitted job duties and responsibilities clearly establish she performed exempt work related to TGF's business operations, such as handling all aspects of accounts payable, resolving vendor disputes and credits, receiving and applying customer payments and credits, reconciling accounts receivable, handling collections (including passing of collections to TGF's outside legal services), accounting for all cash receipts, including reconciled for sales tax reporting, full payroll responsibilities, issuing pay checks or direct deposits of payroll, making 941 deposits, preparing and timely filing tax reports including 940, 941, SUTA, 1099 and W-2, reconciling and managing multiple bank accounts and credit cards, generating financial reports, and various human resources or personnel issues. Elliott testified these jobs took a considerable amount of her time. She also worked in her own office where she had relative freedom from Eskridge's supervision.

Elliott claims she used lists and guidelines in performing her duties, but courts routinely find that an employee still exercises discretion and independent judgment even if they follow

38

detailed company manuals and instructions. *See Cheatham*, 465 F.3d at 585 ("the requirement that [an employee] must consult with manuals or guidelines does not preclude their exercise of discretion and independent judgment."); *Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 374-75 (7th Cir. 2005); *McAllister v. Transamerica Occidental Life Ins. Co.*, 325 F.3d 997, 1001 (8th Cir. 2003).

Like Miller, the fact that Elliott claims that she had to seek approval from TGF's owner in some situations does not preclude a finding that she is an exempt employee. There is nothing in the record to suggest that TGF's guidelines or approval process acted in any way to prevent Elliott from exercising independent judgment or discretion. In fact, despite having guidelines and lists in place, Elliott worked with TGF's outside accountant at the beginning of her employment to better understand the processes for which she was responsible. She was also solely responsible for managing multiple accounts and filings and understood that her failure to do so could result in significant financial impact for TGF.

In view of the various factors set forth by the Department of Labor, and applying those factors to the undisputed job duties that Elliott testified she performed, there can be no question Elliott was properly classified as an exempt employee under the administrative exemption criteria. The record evidence before the Court unequivocally establishes that Elliott:

- carried out major assignments in conducting the operations of the business;
- performed work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business;
- had authority to commit the employer in matters that have significant financial impact;
- investigated and resolves matters of significance on behalf of management; and
- represented the company in handling complaints.

Moreover, Elliott had freedom from direct supervision, performed problem-solving activities on behalf of management, used personalized communication techniques, handled atypical and unusual situations, and acted independently (except for limited direction from Eskridge) in handling virtually all aspects of TGF's financial affairs. All of these are factors that the DOL and the courts have found to be factors favoring an employee's exempt status. *See* 69 Fed. Reg. 22143, 22144 (April 23, 2004) (citing cases).

### H.      Outside Sales Exemption Requirements

The FLSA specifically excludes from its overtime provisions an employee who is employed as an outside salesperson. 29 U.S.C. § 213(a)(1). To qualify for the outside sales employee exemption, all of the following tests must be met: (1) the employee's primary duty must be making sales (as defined by the FLSA), or obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and (2) the employee must be customarily and regularly engaged away from the employer's place or places of business. 29 C.F.R. § 541.500.

#### 1.      Compensation

The salary requirements of the regulation do not apply to the outside sales exemption. 29 C.F.R. § 541.500(c).

#### 2.      Primary duty of marking sales

"Sales," as defined by the FLSA means any sale, exchange, contract to sell, consignment for sales, shipment for sale, or other disposition. 29 C.F.R. § 541.501. In determining whether an employee's "primary duty" is sales, activities incidental to or in conjunction with the sales activities, such as writing sales reports or attending sales conferences are considered exempt outside sales work. 29 C.F.R. § 541.500(b).

3.      **Customarily and regularly engaged away from employer's place of business**

The phrase "customarily and regularly" means greater than occasional but less than constant; it includes work normally done every workweek, but does not include isolated or one-time tasks. As stated by the DOL, the "customarily and regularly" requirement that an employee work outside the employer's place of business more than occasionally does not mean these activities must be performed more than once a week or even every week. W.H. Op. Ltr., FLSA 2007-2 (emphasis added). In fact, the DOL has found that leaving the employer's place of business for one or two hours a day, once or twice a week may be sufficient. *Id.; see also Billingslea v. Brayson Homes, Inc.,* 2007 U.S. Dist. LEXIS 52566 (N.D. Ga. July 19, 2007) (Home sales employees who claim that they were not properly classified as exempt outside sales employees did work "customarily and regularly" away from the employer's place of business even though they spent some time working for temporary sales offices maintained by their employer).

I.      **Kleinsmith Falls Within the Outside Sales Exemption and Therefore is Not Entitled to Overtime**

Kleinsmith interview and was hired for an outside sales position and admitted to having the job duties and responsibilities of an outside sales representative as listed in TGF's job description. More importantly, Kleinsmith admitted that her primary duty was making sales. She was specifically assigned to one of the TGF sales territories, albeit within the general proximity of TGF's office in Garland. Kleinsmith's "office work" was primarily for the purpose of securing outside face-to-face meetings with customers and potential customers of TGF. She admitted that she utilized emails to directors and coaches to set up an opportunity to meet with them. And, these outside sales calls were for the purpose of generating sales – which she did. The DOL has held that not all sales activities must be done outside of the employer's place of

41

business, as long as the employee "customarily or regularly" engages in sales outside of the employer's place of business, and if the other sales activities are incidental to or undertaken in conjunction with the outside sales. *See* W.H. Op. Ltr., FLSA 2006-11 (Mar. 31, 2006).

Kleinsmith was customarily and regularly working outside of the office. In fact, she testified that she spent about 50% of her time out "doing sales" and 50% in the office. She would make appointments for outside the office and then leave to show apparel and items. The DOL has found that leaving the employer's place of business for one or two hours a day, once or twice a week may be sufficient. W.H. Op. Ltr., FLSA 2007-2; *see also Billingslea v. Brayson Homes, Inc.,* 2007 U.S. Dist. LEXIS 52566 (N.D. Ga. July 19, 2007). Kleinsmith's time out of the office for fittings also resulted in face-to-face meetings with customers and at those fittings she had an opportunity to make sales. In fact, it was Kleinsmith's failure to attend outside sales calls in Oklahoma which led to the decision to terminate her.

Because Kleinsmith's primary duty was making sales and she customarily and regularly worked outside of TGF's offices, Kleinsmith was properly classified as exempt from overtime, and TGF is entitled to summary judgment of her claims as a matter of law.

**J.**   **Miller's Improper Payroll Deduction Claim was Adjudicated in Another Proceeding and is Therefore Barred Based on *Res Judicata***

Miller claims that from September 2011 through November of 2011, and again in 2012, Defendants took improper deductions from [Miller's] paycheck, claiming that such amounts were owed by [Miller's] husband's company" Dkt. 1 at ¶19. On March 21, 2013, Miller filed suit against Defendant Scott Eskridge in Justice of the Peace Court in Dallas County, Texas, in civil docket No. JC13-006140, styled "*Toni Miller v. Scott Eskridge aka Team Go Figure,*" ("the JP case") seeking $4,000 in part for "wages garnished by employer to settle business debt where employee did not give written consent or have ownership in company." APP417, 423-424.

Shortly before Miller's termination from TGF, Miller's husband contracted to provide marketing materials for TGF and was given a substantial amount of money in advance. APP417. The job subsequently fell through and TGF requested its money back. *Id.* Because Miller's husband had already spent the money and was unable to repay it, Miller entered into a contract with TGF wherein Miller agreed that TGF would deduct agreed-upon amounts from her paycheck until the debt was paid. *Id.* In all, TGF deducted $600 per month for five pay periods from Miller's paycheck. APP417, 425-445. The JP case was tried on August 30, 2013. APP417, 446. On final disposition of the case, the JP court awarded Miller $1,200 in damages. APP417. A final written judgment has not been sent to Eskridge or his counsel. APP417.

Miller's improper deduction claim is barred by *res judicata*. *Res judicata*, or claim preclusion, bars the litigation of claims that either have been litigated or should have been raised in an earlier suit. *Petro–Hunt, L.L.C. v. United States*, 365 F.3d 385, 395 (5th Cir.2004) (quoting *In re Southmark Corp.*, 163 F.3d 925, 934 (5th Cir.1999)). The test for *res judicata* has four elements: (1) the parties are identical or in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both actions. *Id. Res judicata* is appropriate in this case because Miller has already litigated and adjudicated her claim against "Scott Eskridge aka Team Go Figure" for alleged improper wage deductions from her paychecks. APP417.

### K.     Plaintiffs Cannot Prove Their Damages Claim with Definite And Certain Evidence

Defendants properly classified all three plaintiffs – Miller, Elliott and Kleinsmith – as exempt employees. However, should the Court find a genuine issue of material fact with regard to the issues related to such exemptions, Defendants respectfully request that the Court grant

their summary judgment for the reason Plaintiffs are unable to provide definite and certain evidence that they performed work for which they have not been compensated – in other words, definite and certain overtime hours. "An employee who brings suit for unpaid overtime compensation under the FLSA bears the burden of proving, with definite and certain evidence, that he performed work for which he was not compensated properly." *Hesseltine v. Goodyear Tire & Rubber Co.*, 391 F. Supp. 2d 509, 516 (E.D. Tex. 2005) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946) and *Reeves v. International Tel. & Tel. Corp.* 616 F.2d 1342, 1351 (5th Cir. 1980)). Plaintiffs cannot meet this standard.

In her answers to interrogatories, Miller stated that she worked an unrealistic amount of 89-90 hours per week. APP387-388. She admits this figure is estimated. *Id.* Elliott's answers to interrogatories offer similar unrealistic numbers of 90-92 hours worked per week. APP228, 284-285. And, she also recognizes these are estimates. *Id.*

In interrogatory answers, Kleinsmith estimates she worked "approximately 30-45 hours of overtime each and every week that I worked at [TGF]," meaning 70-85 hours per week. However, Kleinsmith typically arrived at work between 8:30 or 9:00 a.m. and testified that she usually stayed until 6:00 p.m.[13] APP335.1-335.2. In terms of after-hours fittings, if any, Kleinsmith was unable to recall dates in which she attended fittings, the amount of time at each fitting or even where certain fittings took place. APP335.3-335.6, 337.2-337.4. Kleinsmith further admitted that she took off an entire Friday to move with no deduction to her weekly salary. APP337.2.

When questioned in deposition, none were able to state with specificity the number of hours worked or even specifically what each was doing for that many hours. Their

---

[13] Miller testified she could not state when Kleinsmith clocked in and out. APP44.1.

unsubstantiated, vague and inconsistent testimony is little more than a guess and falls short of the "definite and certain evidence" required by law.

Plaintiffs have no evidence that TGF was aware that Plaintiffs worked the overtime hours they now claim. Plaintiffs' text messages or emails indicate only that a message was sent to Mr. Eskridge sometimes early in morning or later in the evening. These records do not provide probative evidence that Plaintiffs worked more than forty hours in any workweek. In fact, Plaintiffs sometimes left the office during business hours for personal errands and sometimes revised their work schedules for personal reasons. APP416-417.

Plaintiffs further contend that during TGF's "busy season," Plaintiffs spent significant time assisting with fittings. Most of TGF's customers followed a traditional public school year, starting at the end of August and concluding the first week of June. APP29. TGF's "busy season" generally occurred after team spring tryouts but before summer camps and competitions in the months of March, April, May and sometimes the beginning of June. APP30-31. Therefore, by Plaintiffs' own admissions, these alleged evening fittings[14] (which Defendants contend were not a frequent occurrence), would have only taken place during one quarter of a work year. Miller, Elliott and Kleinsmith offer little, if any evidence, to provide definite and certain proof that they worked their claimed 89-90 hours, 92-95 hours or 70-85 hours, per week during every week of employment.

### L.    Elliott Cannot Prove Her Damages Claim With Definite and Certain Evidence

From August 12, 2011 until January 15, 2012, a period of approximately five months, Elliott was paid on an hourly basis. During that time frame, she was paid a total of 9.95 hours of overtime resulting in additional overtime compensation of $257.85.

---

[14] Even for calendar entries produced by Plaintiffs most fittings were at least scheduled to occur during TGF's office hours. APP409.

During her deposition, Elliott testified her answers to interrogatories were accurate and correct. APP228, 284-285. Based on her sworn answers, Elliott is alleging that she worked 90-92 hours each and every week she worked at TGF. She then provided inconsistent testimony regarding her first few weeks of employment at TGF. During her deposition, she testified that she worked 8 hours on Saturday and 8 hours on Sunday and that she "probably did that for the first three weeks." APP228.1-228.2. She then admitted that she "cut back a little bit" the fourth week, but did not "know exactly." All she could say she was doing during that time was going through stacks of paper. APP228.2. She could have worked more on a Saturday and less on a Sunday, but she could not exactly say. *Id.* She could not recall the amount of hours she worked on the weekend during her fifth week of employment with TGF. APP228.3.

Elliott is unable to produce sufficient evidence to show the amount and extent of work she performed and further cannot prove that she has in fact performed work for which she was improperly compensated. Elliott cannot state the number of overtime hours she worked during the first weeks of her employment, in which she would have been paid on an hourly, as opposed to a salary basis. Further, Elliott was paid overtime as an hourly employee. APP412, 451-454. Because Elliott cannot prove her damages with definite and certain evidence, Elliott should not recover damages during the short period when she was not an exempt employee

### M.  The Court Should Require Calculation of any Damages Using the Fluctuating Work Week – "Half-Time" Damage Calculation

Miller, Elliott and Kleinsmith were properly classified as exempt employees. However, should the Court find a genuine issue of material fact, TGF respectfully requests that the Court grant TGF a partial summary judgment and decree that in the event a jury finds that Plaintiffs were improperly classified as exempt employees, any calculation of damages must be conducted pursuant to the fluctuating work week method (i.e., the "half-time" method), a method expressly

46

endorsed by the Supreme Court, the Fifth Circuit Court of Appeals, and the United States Department of Labor, Wage and Hour Division. *See Overnight Motor Transp. Co. v. Missel,* 316 U.S. 572 (U.S. 1942) (addressing the fluctuating work week concept); *Blackmon v. Brookshire Grocery Co.*, 835 F.2d 1135 (5th Cir. 1988); W.H. Div. Op. Ltr. (January 14, 2009) (endorsing the fluctuating workweek method).

The evidence demonstrates that, except for authorized (and unauthorized raises) for Elliott, Plaintiffs were paid the same salary every week and that salary was intended to compensate them for all hours worked. In other words, Plaintiffs received their full salary, regardless of however many hours they worked. APP5. As Miller testified:

> Q: You would be paid your salary … whether you worked 80 hours or 90 hours, whatever it was during that two-week time frame or whether you worked 120 hours, right?
> A: Yes. I would receive my paycheck on the 15th and 30th.
> Q: And you understood that your salary was to compensate you for all the time that you worked, correct?
> A: Yes.
> Q: And that's an understanding that you had at the very beginning when you were extended your offer of employment with TGF, that you would be paid on a salary basis to compensate you for all the time that you worked?
> A: Yes.

APP5. Kleinsmith testified as follows:

> Q: As a salaried employee you understood that even on a day that you took off you were paid by TGF, correct?
> A: Correct.

APP337.1. Elliott testified as follows:

> Q: You understood that the salary was your compensation for the hours – the salary for a given pay period was your compensation for your hours worked during that pay period?
> A: Yes.

APP235. During their employment, TGF did not records hours worked. As exempt employees, Miller, Elliott and Kleinsmith were allowed to take off for personal reasons and TGF did not

deduct pay from their paychecks. APP416, 425-445, 447-463. Plaintiffs never complained that their salary did not compensate them for all hours worked. APP417. Elliott never complained, however, that she should not be classified as salaried or should be paid overtime. APP235-236.

The Fifth Circuit expressly recognized the half-time damage principle in *Blackmon v. Brookshire Grocery, Co.*, 835 F.2d 1135 (5th Cir. 1988). Under this principle, the correct calculation of damages in misclassification cases is to award the successful plaintiff *only* the half time premium for overtime hours because the plaintiff's salary compensated the plaintiff for the straight time. *Id.* at 1138-39. This Court should rule the half-time damage calculations is the appropriate method should Plaintiffs be adjudicated to be non-exempt employees.

## IV.     CONCLUSION

For these reason stated, Defendants request that the Court grant their Motion for Summary Judgment, dismiss Plaintiffs' claims in their entirety with prejudice, and award Defendants their costs of suit and enter such other and further relief as the Court deems just and proper. Alternatively, Defendants request that the Court grant its partial summary judgment and decree that, in the event a jury is to find Plaintiffs were improperly classified as an exempt employee, any calculation of damages must be conducted pursuant to the fluctuating work week method (i.e., the "half-time" method).

Respectfully submitted,

/s/ Claudine G. Jackson
Claudine G. Jackson
Texas State Bar No. 00793800
Joseph F. Cleveland, Jr.
Texas State Bar No. 04378900
cjackson@belaw.com
jcleveland@belaw.com

BRACKETT & ELLIS,
A Professional Corporation
100 Main Street
Fort Worth, Texas 76102-3090
Telephone: 817.338.1700
Facsimile: 817.870.2265

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2014, I electronically filed the foregoing document with the Clerk of Court for the United States District Court, Northern District of Texas, using the electronic case filing system of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to all attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

James Moulton
Attorney at Law
939 Hwy. 80 East
Suite 486
Mesquite, TX 75150

/s/ Claudine G. Jackson
Claudine G. Jackson

49